Wm. Schley and Patrick McLaughlin, for petitioners.

John Ritchie and Albert Ritchie, for defendant.

---

## Case No. 10,568.

### ORHANOVICH v. The AMERICA.

[25 Int. Rev. Rec. 306; 14 Phila. 515; 36 Leg. Int. 279; 26 Pittsb. Leg. J. 203.]

District Court, E. D. Pennsylvania. July 8, 1879.

TOWAGE—DUTY OF TUG IN MAKING UP TOW—COLLISION BETWEEN TOWS.

[In making up a tow it is the duty of a tug to consider the character of the vessels, the channels through which they are to pass, and all other matters bearing on their safe transportation; and if the voyage involves the passage through narrow and shallow channels, and the tug, after taking one tow, afterwards attaches to it, by a hawser, another which she knows to be a very bad steerer, she is responsible for a collision resulting therefrom by which the first tow is injured.]

In admiralty.

Henry Flanders and H. G.. Ward, for libellant.

J. Warren Coulston, for respondent.

BUTLER, District Judge. The owners of the steam tug America, contracted with the master of the bark Rebecca, to take her from this port to Bombay Hook. They started on the 1st of December, 1877. On reaching the Schuylkill, another bark, the Dudman, was taken on behind the Rebecca. They proceeded down the river in this order, to a point near the channel buoy in the Bight of New Castle, where the Rebecca grounded, and was run into by the Dudman, and seriously injured. The libellant charges the collision to carelessness of the respondent; first, in taking the Dudman along; second, in making up the tow, and third, in managing the tug in the channel where the accident occurred. The respondent was bound to exercise reasonable care for the safe transportation of the bark. If he took another vessel along. as was his right to do, he must determine the order in which the vessels should go, and the manner in which they should be towed. In doing this, he must consider the character of the vessels, the channels through which they are to pass, and all other matters involved in the question of their safe transportation. This being done, he must conduct the tow with such skill and care as are calculated to secure it against accident, under ordinary circumstances: The Margaret, 94 U. S. 499; The Quickstep, 9 Wall. [76 U. S.] 665; The Sweepstakes [Case No. 13,687]. Was there carelessness in taking

the Dudman along? If, as alleged, her steering qualities were so bad as to render her virtually unmanageable in the river, and the respondent was aware of this, there was. That she was a bad steerer, indeed very bad, is abundantly shown. The witnesses agree respecting it. The master of the tug says she "steered. badly, sheered all over the river going down, first on one quarter then on the other of the Rebecca;" and the mate of the tug says she "steered wildly going down the river." Captain Wilkins, called by the respondent, says she steered so badly that it required two boats to take her down the Schuylkill; and when the respondent met and took her in tow on this occasion, she was being thus conducted, by the joint efforts of two tugs. That the respondent was aware of her peculiarity in this respect, is equally clear; he had towed her before, and knew she steered badly; he so testifies. It does not appear that he ever towed her in company with another vessel before this occasion, or attempted to do so. And if he had been without such previous knowledge, what he observed in passing down the river should have warned him of the danger of taking such a tow through the narrow, shallow channel, near New Castle. And while a proper regard for the libellant's safety, forbade taking the Dudman along, in my judgment, it especially forbade taking her astern of the libellant's vessel. Without considering the order in which two vessels of unequal draft, with proper steering capacity, should be placed in a tow (about which decided opinions were expressed by the court in The Morton [Case No. 9,864]; The Zouave [Id. 18,221], and The Sweepstakes [supra], though practical seamen, as the evidence here shows, seem to disagree respecting it). I feel no hesitation in saying that to place this unmanageable craft behind, in passing through a narrow, shallow channel, was calculated to produce disaster. The width in the Bight, at places, does not exceed seventy yards, and the depth (with the tide as it was at the time of the accident) is twenty-two feet. The draft of the Rebecca is twenty and a half feet. As obedient to her wheel as she is shown to be, she would respond very tardily when within a foot and a half of the bottom, and finds some difficulty in controlling her course. With the Dudman wildly tugging at her stern she would be helpless, very likely to ground, and be run into by her unwieldy companion. And this is precisely what occurred. The respondent himself says (in the answer filed): "The grounding of the Rebecca was further caused by the bad and reckless steering of the Dudman. The latter vessel, just prior to the Rebecca's sheering eastward, * * * having taken a sheer to the westward, which caused the Rebecca to disobey her wheel

18FED.CAS.—51

and sheer eastward." The Rebecca being thus grounded and run into by the Dudman, who should not have been there, and especially in the position she occupied, the respondent must answer for the consequences, unless, indeed, the Rebecca was also in fault. The respondent says she was; that the collision would not have occurred but for the order given by her pilot to starboard the Dudman's helm, the moment before. At this time, the Dudman was forty to sixty fathoms back, to westward. Her sheer in that direction was broken. The master of the tug says: "About the time the Rebecca grounded, the Dudman's sheer westward was broken." The pilot of the Rebecca says the same. The tide was running down, and the wind coming from the west or northwest. The pilot says: "The Dudman was coming right at us when I told them to starboard their helm; * * * and if she had minded her wheel she would have gone clear of us to leeward." The evidence would not justify a conclusion that the order was erroneous; that without it the Dudman would have kept off to windward. Her course at all times was uncertain, and where she would have gone without the order no one can tell. It seems quite as probable she would have struck the Rebecca as that she would not. But if this were otherwise, the result would be the same. An erroneous order given when in peril would not stand in the libellant's way. That the Rebecca was then in peril is clear. The pilot (more capable than all others of judging), believed so; and in consequence gave the order. The respondent having created the peril, could not take advantage of an error made in the effort to escape. The Zouave [supra].

[NOTE. A reference was made to a commissioner, to whose report exceptions were filed. This court confirmed the commissioner's report, and entered a decree for libelant in accordance therewith. Case No. 11,619a. An appeal was then taken to the circuit court, where the decree of the district court was affirmed. 4 Fed. 337.]

ORIANA, The. See Cases Nos. 1,148 and 1,150.

